UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| JAMES N. STRADER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3: 09-62-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KENTUCKY DEPARTMENT OF FISH | ) | |
| AND WILDLIFE RESOURCES; | ) | |
| JONATHAN W. GASSETT, individually | ) | |
| and in his official capacity as | ) | |
| Commissioner of the Kentucky | ) | |
| Department of Fish and Wildlife | ) | **MEMORANDUM OPINION** |
| Resources; and JOHN DOES 1-10, | ) | **AND ORDER** |
| currently unknown employees, officers, | ) | |
| and agents of the Kentucky Department of | ) | |
| Fish and Wildlife Resources, in their | ) | |
| individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the motion for summary judgment filed by Defendants Jonathan W. Gassett, individually and in his official capacity as Commissioner of the Kentucky Department of Fish and Wildlife Resources (KDFWR), and John Does 1-10, unknown KDFWR employees, in their individual and official capacities. [Record No. 34] The defendants argue that there are no genuine issue of material fact to be resolved with respect to Plaintiff James Strader's remaining claims of First Amendment retaliation and defamation. Strader, however, maintains that sufficient evidence has been produced to submit the matter to a jury. For the reasons explained below, the motion for summary judgment will be granted.

**I.**

Strader is the host of a long-running radio show, *Outdoors with Jim Strader*, devoted to hunting and fishing issues. Until 2010, he also held an annual hunting and fishing expo in Louisville, Kentucky. Although Strader enjoyed a mutually beneficial relationship with KDFWR prior to Gassett's appointment as Commissioner, his reporting on the agency led to trouble after Gassett took the helm. Of particular relevance to the present motion, Strader criticized KDFWR's use of the Telecheck system, which allows hunters to report their kills by telephone. Strader's criticism prompted Gassett to withdraw KDFWR's support for his radio show and expo.

Most of Strader's Complaint was dismissed for failure to state a claim. [*See* Record No. 17] Of his seven original causes of action, only part of a First Amendment retaliation claim (Count One) and a defamation claim (Count Six) remain. However, neither can withstand summary judgment.

**II.**

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* (c)(1). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, a nonmoving party must establish the existence of a genuine issue of material fact as to each essential element of his case. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must do more than cast some "metaphysical doubt" on the material facts. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Matsushita*, 475 U.S. at 586). Instead, he must present "significant probative evidence" of a genuine dispute in order to defeat the motion for summary judgment. *Id.*

As an initial matter, the Court need not consider summary judgment with respect to the John Doe defendants. The Federal Rules of Civil Procedure provide that "[i]f a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made within a specified time," unless "the plaintiff shows good cause for the failure." Fed. R. Civ. P. 4(m). The record does not reflect that Strader has made any effort to identify and serve the Doe defendants in this case. On July 19, 2012, the Court notified Strader that his claims against those defendants were subject to dismissal under Rule 4(m) unless he showed good cause within seven days. [Record No. 42] Strader did not respond. Therefore, his claims against John Does 1-10 will be dismissed pursuant to Rule 4(m), and the Court will proceed with its summary judgment analysis only as to Gassett.

### A. First Amendment Retaliation (Count One)

As noted previously, following the Court's ruling on the motion to dismiss, only two allegations from Count One remain: Strader's claims that Gassett unconstitutionally retaliated against him by: (1) "funding and promoting a competing radio show," and (2) "sponsoring, advertising, promoting and participating in a competing hunting and fishing expo." [Record No.

1, p. 15 ¶¶ 86-87] Strader did not mention the latter claim in his summary judgment response and thus appears to have abandoned it. Because he has presented no evidence to support his retaliation claim based on KDFWR's alleged involvement with a competing hunting and fishing expo, summary judgment is appropriate with respect to this claim.

Nor is there sufficient evidence to support Strader's allegation that Gassett retaliated against him for his reporting on KDFWR by "funding and promoting a competing radio show." [*Id.*, p. 10 ¶ 58; *id.*, p. 15 ¶ 86] The show in question is *Kentucky Afield Radio*, which KDFWR launched in March 2008. It airs during the same time slot as Strader's show and uses a similar format. In his Complaint, Strader alleged that the purpose of *Kentucky Afield Radio* was "to steal [his] listening audience and punish him for reporting KDFWR's questionable policies and practices." [*Id.*, p. 10 ¶ 58] As a result of this alleged retaliation, Strader claimed, his "radio show was economically harmed and [his] reputation was damaged" [*id.* ¶ 60], and he "has suffered and continues to suffer emotional and economic damages."[1] [*Id.*, p. 16 ¶ 93; *see also id.*, p. 12 ¶ 73 (alleging that Strader "has and will continue to incur irreparable injury to his reputation and livelihood" as a result of the defendants' actions)]

To survive summary judgment on his retaliation claim, Strader must establish a genuine issue of material fact with respect to three elements:

> "(1) that [he] was engaged in a constitutionally protected activity; (2) that [Gassett's] adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3)

---

[1] The allegation of continuing injury prevented this claim's dismissal on statute of limitations grounds. [*See* Record No. 17, pp. 9-12 (discussing continuing-violation doctrine and finding that facts as alleged in the Complaint supported application of the doctrine to Strader's "competing radio show" claim).]

> that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights."

*Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). The parties do not dispute that the first element (constitutionally protected conduct) is met. In its previous decision, the Court found that the adverse-action element was also satisfied because "Strader's livelihood is dependent upon his radio show . . . , and he alleges injury to his livelihood as a result of the defendants' actions." [Record No. 17, p. 14]

That was enough to get the claim past a motion to dismiss. At the summary judgment stage, however, Strader must present proof supporting those allegations. But he addresses the issue of injury only fleetingly, in the final paragraph of his summary judgment response:

> Defendants also argue that Mr. Strader has not demonstrated any injury from Defendants producing the competing radio program. But contrary to Defendants' contention, Mr. Strader has produced evidence of injury from KDFWR continuing to produce the competing radio show. Indeed, as Defendants well[]know, in Donna Martin's deposition testimony, she provided Defendants with several illustrations of this occurring and its impact upon Plaintiff's health. Moreover, the obvious risk posed by KDFWR's competing radio show has not escaped the attention of [the] hunting and fishing public.

[Record No. 39, p. 16] Strader then cites Exhibits 15 and 16 to his response, which are printouts of reader comments from Internet articles regarding KDFWR's radio program. [*See id.* (citing Record Nos. 39-16, 39-17)] The comments contain anonymous speculation, in early March 2008, that "ole[] Strader might have some competition" and that he "may find himself in a bidding war for his time slot." [Record No. 39-16, pp. 2-3] Another reader questioned why *Kentucky Afield Radio* aired at the same time as Strader's show. [Record No. 39-17, p. 2]

While the Sixth Circuit has recognized that a threat to one's economic livelihood may constitute adverse action supporting a First Amendment retaliation claim, the adverse action must have "caused the plaintiff to suffer an injury" that would likely deter future speech. *Paige*, 614 F.3d at 281. In *Paige*, for example, the plaintiff was fired after the defendant called her employer and made false statements regarding her speech at a public meeting. *See id.* at 277. "Losing one's job and accompanying benefits," the court explained, "is certainly severe enough to deter a person of ordinary firmness from speaking at public meetings." *Id.* at 281. Likewise, the plaintiff in *Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010), lost her job after the defendant made three calls to her employer complaining about statements she had made; she also was denied zoning and signage variances necessary to her business. *See id.* at 721, 728-29. And in *Harris v. Bornhorst*, 513 F.3d 503 (6th Cir. 2008), the defendant's comments to a potential employer "actually prevented [the plaintiff] from securing the career that he wants." *Id.* at 519. The court found it "difficult to imagine" "[a] more effective deterrent." *Id.* In each of these cases, the adverse action was a threat to the plaintiff's livelihood that resulted in real, measurable harm.

Here, by contrast, Strader does not even argue, much less offer proof, that his ability to make a living has been hindered by *Kentucky Afield Radio*'s existence. Although he claims that he "has produced evidence of injury from KDFWR continuing to produce the competing radio show" and that Gassett is aware of deposition testimony containing "several illustrations of this occurring," he fails to cite any evidence whatsoever in support of these assertions.[2] [Record No.

---

[2]Even if Martin's deposition were in the record, which it does not appear to be, the Court is under no obligation to seek it out and examine it for evidence supporting Strader's claims. Rule 56

39, p. 16] Evidence that some audience members recognized a "risk" to Strader's show when the competing show first went on the air is not probative of whether any harm actually came to pass.

Gassett, meanwhile, points to substantial evidence demonstrating that Strader has not been economically harmed by KDFWR's radio program. Strader admitted at his deposition that his show remains ranked number one in its time slot for the Louisville market and that *Kentucky Afield Radio* has not hurt his listenership, ratings, or advertising sales. [Record No. 34-2, pp. 4-6] When asked what negative effects he had suffered as a result of the competing show's existence, Strader stated that it had "cost [him] a certain amount of distress worrying about a government entity running a show against [him] using their resources." [*Id.*, p. 6] This "distress," he testified, "made [him] fearful that they would perhaps go to the radio station and attempt to buy out [his] time slot, compete with [him] in that type of fashion," and "that it would over[]time erode [his] listenership basis." [*Id.*, p. 7] But nowhere has he shown that those fears were realized. Without evidence of injury, Strader's remaining retaliation claim cannot survive summary judgment.

### B. Defamation (Count Six)

There is likewise insufficient evidence to support Strader's defamation claim, which arises out of an incident that occurred in December 2008. While at KDFWR headquarters for

---

requires that parties seeking or opposing summary judgment "cit[e] to particular parts of materials in the record, including depositions." Fed. R. Civ. P. 56(c)(1)(A); *see Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008) ("'[T]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989))).

a public meeting of the Kentucky Fish and Wildlife Commission, Strader was in the lobby talking to wildlife photographer Neil Kaufman when they were approached by KDFWR biologist Karen Waldrop.  Strader and Waldrop began discussing the deer harvest, and Strader expressed doubt as to the accuracy of that year's deer kill data from Telecheck.

As Strader recalls his comments, he "expressly and repeatedly stated that [he] was *not* accusing Dr. Waldrop or any other KDFWR employee of fabricating or manipulating deer kill data." [Record No. 39-12, p. 2 ¶ 7]  He denies ever making such an accusation.  [*Id.* ¶ 11] Kaufman, by affidavit, corroborates Strader's version of events.  [Record No. 39-13]  But according to Gassett (who was not a party to the conversation), Waldrop related that Strader had "accused [her] of making data up, that [she] and Doctor [Tina] Brunjes were accused of making data up in front of the public."  [Record No. 34-5, p. 3; *see also id.*, p. 4 ("Q. What Doctor Waldrop said was that Mr. Strader accused them of making up information and entering it in? A. Correct.")]  Gassett testified that he confirmed Waldrop's account with Mark Marraccini, another KDFWR employee who witnessed the exchange, and that Marraccini told him the "[s]ame story that Doctor Waldrop did.  That basically [Strader] was upset, that he — in a fairly aggravated and elevated tone accused our department, and specifically, her and Doctor Brunjes . . . of falsifying data."  [*Id.*, p. 3]  A third KDFWR employee who was present during the conversation, David Casey, testified that when summoned to talk to Gassett "about what was said in the lobby," he reported, "Strader and Kaufman are fussing about Telecheck and they say that we cooked the books."  [Record No. 39-15, p. 3]

In the February 2009 issue of the Commissioner's newsletter, responding to a reader question concerning the agency's absence from Strader's expo that year, Gassett stated:

> Recently Mr. Strader publicly maligned hard-working department professionals. He questioned their integrity by accusing them of fabricating deer kill data in defense of Telecheck, the most efficient and accurate hunter data collection system in department history.
>     . . . .
>
> In light of these baseless personal attacks, I chose not to ask some of the nation's preeminent wildlife professionals to support Mr. Strader's radio show or his expo.

[Record No. 34-9, p. 2]  These statements referred to the December 2008 encounter between Strader and Waldrop.  [*See* Record No. 34, pp. 21-23]  In Strader's view, they constitute defamation.

Under Kentucky law, there are four elements to a claim of defamation: "1. defamatory language[,] 2. about the plaintiff[,] 3. which is published[,] and 4. which causes injury to [the plaintiff's] reputation." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004).  A plaintiff who is a public figure must also demonstrate, by "clear and convincing" evidence, that the defamatory statement was made with actual malice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  "Actual malice," in this context, does not mean "malice as an evil intent or a motive arising from spite or ill will." *Masson v. New Yorker Magazine*, 501 U.S. 496, 510 (1991).  Instead, the term refers to a defendant's "knowledge of falsity or reckless disregard as to truth or falsity." *Id.* at 511.  The plaintiff must present evidence "'sufficient . . . to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 688 (1989) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  In other words, there must be evidence that the

defendant had a "'high degree of awareness of . . . probable falsity'" when he made the statement(s) in question. *Id.* (omission in original) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

The four initial elements are met here. Statements that Strader had falsely accused KDFWR personnel of wrongdoing would tend to tarnish his reputation as a journalist and thus are defamatory. *See McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). ("[A] writing is defamatory if it tends to . . . injure [the plaintiff] in his business or occupation."). Furthermore, Gassett's statements were about Strader, and they were published. Finally, because the statements attributed conduct to Strader that "is incompatible with his . . . profession," they are defamatory per se, and injury to his reputation is presumed. *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. Ct. App. 2006). The question, then, is whether Gassett's statements were made with actual malice, *i.e.*, with knowledge that they were false or with reckless disregard as to their truth or falsity. *See Masson*, 501 U.S. at 511.

Strader contends that "there is ample evidence permitting jurors to infer the existence of actual malice" on Gassett's part. [Record No. 39, p. 12] In the next sentence, however, he asserts:

> Commissioner Gassett previously made threats against Mr. Strader, expressed ill[]will towards him and obliquely threatened to end his radio career. The statements published by Commissioner Gassett in the newsletter appear carefully crafted to create the misimpression that Mr. Strader has leveled accusations against KDFWR personnel on his radio show for the purpose of "growing" his ratings.

[*Id.*] He thus appears to confuse the actual-malice standard with the traditional definition of malice.[3] As explained above, malicious behavior does not equate to "actual malice" for purposes of a defamation claim. *Masson*, 501 U.S. at 510; *Harte-Hanks*, 491 U.S. at 666-67.

In a more relevant argument, Strader asserts that Gassett "knew or reasonably should have understood that Mr. Strader did not make any comments 'publicly' in his private conversation with Dr. Waldrop," and thus the statement that he had "publicly maligned" KDFWR employees was untrue. [Record No. 39, p. 11; *see also id.*, pp. 6, 10, 12; Record No. 39-12 ¶¶ 5, 18] "Equally false," Strader maintains, "is Commissioner Gassett's representation that Mr. Strader accused KDFWR personnel of 'fabricating deer kill data.'" [Record No. 39, p. 11] In support, Strader cites three portions of Waldrop's deposition and a single response from the deposition of David Casey. [*Id.*, pp. 10-11 & n.1]

Waldrop, Strader points out, testified that he "studiously avoided saying that KDFWR personnel were manipulating data." [*Id.*, p. 11] When read in context, however, Waldrop's testimony establishes that she nonetheless took his comments that way:

> Q. Based on that conversation, it was your understanding of what Mr. Strader said, you felt as if he was accusing someone who worked for you of manipulating the data?

---

[3] Strader also argues that Gassett's comments in the newsletter were intended "to leave readers with the misimpression that Mr. Strader had publicly accused KDFWR personnel of falsifying deer kill data on his radio show for the sake of 'growing [his] radio show ratings.'" [Record No. 39, p. 7] "Given Commissioner Gassett's efforts to create this misimpression and his previous statements expressing a desire to end Mr. Strader's radio show," Strader contends, "jurors may reasonably infer that Commissioner Gasset[t] recklessly and/or maliciously made these statements for the purpose of causing him harm via undermining his credibility as a journalist." [*Id.*] Again, Strader's argument is premised on a mistaken interpretation of the actual-malice requirement.

-11-

> A.   . . . . Somebody that worked at Kentucky Department of Fish and Wildlife of manipulating data.
>
> Q.   And you base that understanding on what?
>
> A.   Several things. One, that I asked him specifically, are you accusing me? And he said, well, maybe not you. I said, are you accusing someone of my staff? He said, well, somebody here has manipulated these data and has done it. Now, he didn't say some Fish and Wildlife employee, *but we had been talking about Fish and Wildlife data that's been supplied to the public by Kentucky Department of Fish and Wildlife and so yes*.

[Record No. 39-14, pp. 6-7 (emphasis added)] Thus, in Waldrop's view, while Strader did not explicitly state that he believed KDFWR employees had tampered with the data, that was the clear implication. Likewise, although Casey testified that Strader "did not say who" had allegedly manipulated data [Record No. 39-15, p. 2], his "perception" was that Waldrop "took [Strader's comments] personally" and that Strader meant "somebody else at the department had changed the numbers, cooked the books." [*Id.*, p. 3]

Strader does not deny having suggested that "somebody" manipulated the data. [*See* Record No. 39, p. 11] Regardless of what precisely he said or what he meant by it, his words were apparently interpreted by Waldrop, Casey, and Marraccini as an accusation against KDFWR personnel, and their interpretation was the basis for Gassett's statements in the newsletter. Strader has not shown that Gassett had any reason to believe his employees' characterization of the comments was inaccurate.

Nor do the cited depositions suggest that Gassett knew Strader had not spoken "publicly." Waldrop testified that not only she, Strader, and Kaufman were involved in the conversation, but also "everybody else standing in that room that were all listening to it. It wasn't in a private

office or anything. . . . [I]t was out in public, it was not private. . . . [I]t was definitely public." [Record No. 40-1, p. 6] Casey agreed that "[a]nyone . . . could have overheard what was said." [Record No. 39-15, p. 2] According to Waldrop, "[t]here were a lot of other people in the lobby" when the conversation took place. [Record No. 39-14, p. 4] Based on typical attendance at Commission meetings, Gassett estimated that "50 to 70 members of the general public" were in the lobby and "potentially saw" the exchange. [Record No. 39-3, p. 8] Though Strader insists that it began as a private conversation, he does not dispute that members of the public could — and likely did — hear his comments, or that those comments were made in a public place. More importantly, he does not point to any evidence that Gassett "entertained serious doubts as to" whether the statements were made publicly. *Harte-Hanks*, 491 U.S. at 688.

Finally, the Court rejects Strader's contention that summary judgment is inappropriate because the actual-malice determination turns on the credibility of Gassett and other KDFWR employees. [*See* Record No. 39, pp. 12-13] In opposing summary judgment, it is not enough to merely assert that a jury could disbelieve the defendant or his witnesses. *Anderson*, 477 U.S. at 256. Rather, "the plaintiff must present affirmative evidence" that would support a verdict in his favor. *Id.* at 257. Strader has made no such evidentiary showing here. In the absence of "clear and convincing" evidence that Gassett seriously doubted the veracity of his statements, Strader's defamation claim fails. *Id.*; *see Harte-Hanks*, 491 U.S. at 688.

### III.

Strader has failed to establish a genuine issue of material fact with respect to each essential element of his retaliation and defamation claims. Accordingly, it is hereby

**ORDERED** as follows:

(1)   The Motion for Summary Judgment of Defendants Jonathan W. Gassett and John Does 1-10 [Record No. 34] is **GRANTED** with respect to Gassett in his individual and official capacities and **DENIED** as moot with respect to the John Doe defendants.

(2)   The claims asserted against the John Doe defendants are **DISMISSED**, without prejudice, pursuant to Federal Rule of Civil Procedure 4(m).

(3)   The defendants' motion *in limine* [Record No. 35] is **DENIED** as moot.

(4)   All claims having been resolved, this matter is **DISMISSED** and **STRICKEN** from the Court's docket. A final and appealable judgment will be entered this date.

This 6th day of August, 2012.

Signed By:
*Danny C. Reeves*   DCR
United States District Judge